**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SITHY BIN, | ) Case No.: 1:11-cv-01724-LJO-JLT |
| | ) |
| Petitioner, | ) FINDINGS AND RECOMMENDATIONS TO |
| | ) DENY PETITION FOR WRIT OF HABEAS |
| v. | ) CORPUS (Doc. 1) |
| | ) |
| RICK M. HILL, | ) ORDER DIRECTING THAT OBJECTIONS BE |
| | ) FILED WITHIN TWENTY-ONE DAYS |
| Respondent. | ) |
| | ) |

Petitioner is a state prisoner proceeding pro se/through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation serving an indeterminate sentence of forty years-to-life. The sentence was issued by the Stanislaus County Superior Court of California following his 2008 conviction by a jury of: (1) shooting at an inhabited building (Cal. Pen. Code § 246); ((2) assault with a semiautomatic firearm (Cal. Pen. Code § 245(b)); and (3) active participation in a criminal street gang. (Cal. Pen. Code § 186.22(a). (Clerk's Transcript on Appeal ("Volume CT") 364-367). The jury also found true a firearm enhancement related to each substantive conviction, pursuant to Cal. Pen. Code § 1022.5. (Id.).

Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the

1

1  "5th DCA"), which issued an unpublished decision and affirmed Petitioner's conviction on September

2  24, 2009.  (Doc. 18, Lodged Documents ("LD") 4, Ex. A.).   On January 13, 2010, the California

3  Supreme Court denied his petition for review.  (LD 5).

4       On April 20, 2010, Petitioner filed a state habeas corpus petition in the Superior Court that was

5  denied on June 30, 2010.)  (LD 9, Ex. B).  On August 19, 2010, Petitioner filed a habeas petition in the

6  5th DCA that was denied on October 21, 2010.  (LD 10).  On December 8, 2010, Petitioner filed a state

7  habeas petition in the California Supreme Court that was denied on May 18, 2011.  (LD 11).

8       On October 17, 2011, Petitioner filed the instant petition.  (Doc. 1). Respondent's answer was

9  filed on January 18, 2012.  (Doc. 12).  On March 19, 2012, Petitioner filed his Traverse.  (Doc. 15).

10  Respondent concedes that the all grounds for relief in the petition have been fully exhausted.  (Doc.

11  15, p. 9).  However, Respondent contends that ground one is procedurally defaulted because the state

12  court denied the claim for violating an adequate and independent state rule.  (Id.).

13                          **FACTUAL BACKGROUND**

14       The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

15  The family of T.Y. was having a barbecue at their residence (the residence). One of the guests
16  was C.H. C.H.'s boyfriend was S.S. Before S.S. arrived at the barbecue, C.H. decided to go for
    a ride in the vehicle of another guest, Rathana Reach. C.H. was with Reach when S.S. arrived
17  at the barbecue. When C.H. returned, a confrontation ensued between S.S. and Reach. Angry
    words were exchanged and then Reach walked toward his vehicle. As Reach approached his
18  vehicle to leave, he exclaimed that he had a bullet waiting for S.S. About an hour later, Reach
    was observed repeatedly "speeding up and down the street" in front of the residence.

19  Several hours later, Reach returned to the residence with H.T. and P.N. in his vehicle. A white
    Mustang with four other people inside arrived at the same time. Rithy Khe was the driver of
20  the Mustang, and Bin and two females were passengers in the vehicle.

21  Bin, Khe and the two girls headed to the front of the driveway. S.S., T.Y., and his brother,
    S.Y., approached the group of four. Angry verbal exchanges ensued. S.S. and S.Y. were telling
22  the others that they did not want any trouble at their house. Khe was saying things like "C-
    dubb" and "why you trying to disrespect C-dubb." The girls also were yelling "C-dubb."
23
    The group of four then returned to the white Mustang. S.S. followed and Bin hit S.S. in the
24  back of the head. T.Y. and his brother went to the aid of S.S. T.Y. saw one of the girls pull out
    a gun and fire it into the air. T.Y. fell to the ground. When he looked up he saw Bin grab the
25  gun from the girl's hand. Bin began firing the gun towards the residence. The people in front of
    the residence also fell to the ground. Bin then returned to the Mustang. Khe got into the

26

27  _____
    [1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
28  Thus, the Court adopts the factual recitations set forth by the 5th DCA.

                                        2

Mustang and drove away with his passengers. Reach returned to his vehicle and drove away with his passengers. T.Y.'s aunt was injured by one of the bullets. T.Y. denied that Khe attempted to calm the situation, recalling only gang-related statements.

P.N. admitted being a member of the Crips With Attitude (CWA) gang. On the day of the shooting, P.N. was at Bin's house for a few hours with Bin, Khe, Bin's brother, Bin's girlfriend, H.T., and another female. Reach drove up, parked his vehicle, and approached the group. Reach said he had dropped off S.S.'s girlfriend at the barbecue and S.S. became upset. The group decided to return to the barbecue and talk to them to solve the problem. They knew that the younger people at the barbecue belonged to a different gang, the Devils of the North (DOTN).

Everyone got out of their respective vehicles when they arrived at the barbecue. The two groups approached each other. P.N. intended to fight one of the other group members and was yelling "C-dubb." No one else was saying any other gang phrases. P.N. and his gang decided to leave for the park where the two groups could talk some more and probably fight. As P.N.'s group approached their vehicles, S.S. approached, holding an empty 40-ounce bottle of beer. Bin hit S.S., apparently believing S.S. was going to attack him with the beer bottle. A fight ensued, including many gang taunts. During the fight, P.N. heard gunshots and headed for a car. When he got to the car, he saw a girl shooting a gun into the air. The car he was in drove off and he did not see what happened to the gun. P.N. did not know where the second vehicle went. P.N. testified the second vehicle was a primer gray Honda driven by one of the girls. Khe was not the driver of the vehicle.

P.N. admitted being interviewed by an officer about the shooting, but he claimed he was drunk and high on ecstasy and did not know how he had answered the questions posed to him.

N.P. was attending the barbecue when she observed two vehicles arrive, a white Mustang and a small black Honda. The occupants of the vehicles got out and an argument ensued. Eventually a fight broke out between the two groups. N.P. observed a girl pull out a gun and start shooting into the air. A guy then grabbed the gun from the girl and started shooting towards the residence. After about five to seven shots at the residence, the group got into their vehicles and left. N.P. was not able to identify the individual shooting the gun or who was involved in the fight.

S.S. confirmed that when he arrived at the barbecue, his girlfriend, C.H., was not present because she was riding in Reach's vehicle. S.S. was upset when Reach and C.H. returned, and he exchanged heated words with Reach. Reach then left.

Reach returned later that evening driving his car and accompanied by a white Mustang. Six to eight people exited the two vehicles. Khe was driving the Mustang. The two groups approached each other and words were exchanged. Reach's group wanted to fight, so it was suggested that the two groups proceed to the park. Gang-related statements were made by both groups. When S.S. approached Khe to state that he did not want to fight, he was hit by Bin. That is when the fight began.

A short while later a female started shooting a gun into the air. When S.S. looked up again, he saw Bin with the gun shooting at the residence and the people standing near it. After the shooting stopped, the group got back into their vehicles and left. Khe drove away in the Mustang. S.S. heard Khe attempt to calm things down. He did not hear Khe make any gang-related statements.

Ten nine-millimeter casings were recovered from the scene. Ballistics testing established that the casings were fired from a Glock semiautomatic handgun located during a search of Bin's

3

house.

The information charged Bin, Khe, and Reach with attempted murder (§§ 187, 664), discharge of a firearm at an inhabited dwelling (§ 246), assault with a semiautomatic firearm (§ 245, subd. (b)), and active participation in a criminal street gang (§ 186.22, subd. (a)). In addition the following enhancements were alleged: (1) in counts I and II it was alleged that each defendant was a principal in the offense, and at least one principal in the offense personally discharged a firearm causing great bodily injury within the meaning of section 12022.53, subdivision (d); (2) in counts I, II, and III it was alleged the offense was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b); (3) in counts III and IV it was alleged that Bin personally used a firearm within the meaning of section 12022.5, subdivision (a); and (4) for each count it was alleged that Khe had a prior conviction that qualified as a strike within the meaning of section 667, subdivision (d).

The jury found Bin not guilty of attempted murder. Bin was found guilty of shooting at an inhabited building (§ 246), assault with a semiautomatic firearm (§ 245, subd. (b)), and participation in a criminal street gang (§ 186.22, subd. (a)). For the shooting at an occupied building count, the jury found true the allegation that a principal personally used a firearm causing great bodily injury (§ 12022.7), and that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)). For the assault with a firearm count, the jury found true the allegation that Bin personally used a firearm (§ 12022.5, subd. (a)), and that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)).

The jury found Khe not guilty of attempted murder, discharge of a firearm at an inhabited dwelling, and assault with a semiautomatic firearm (counts I, II, and III). Khe was found guilty of active participation in a criminal street gang. The jury found Reach not guilty of each charged offense.

Bin was sentenced on count II to an indeterminate term of 15 years to life (§ 186.22, subd. (b)(4)), plus an additional term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), for a total indeterminate term of 40 years to life. The sentences on the remaining counts and enhancements were imposed concurrently to the indeterminate term.

(LD 4, Ex. A, pp. 2-6).

## DISCUSSION

I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

4

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. at 405-406.  A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(*per curiam*).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003).  In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Id., at 786.  As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief

5

functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction.  Id., quoting Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring in judgment).  The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Richter, 131 S.Ct. at 787-788. Put another way, a state court's determination that a claim lacks merit bars federal habeas relief so long as "fairminded jurists could disagree" on the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.

The AEDPA also requires that considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure

fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

### III.  Review of Petitioner's Claims.

The instant petition alleges as grounds for relief: (1) the convictions on the gang charges and enhancements were obtained through prosecutorial misconduct; (2)  the convictions on gang charges and enhancements were obtained through inadmissible testimony of a witness not subject to cross-examination, in violation of Petitioner's Sixth amendment rights; (3) insufficient evidence to support the convictions on gang charges and the gang-related enhancements; and (4) ineffective assistance of trial counsel.

///

A.  Prosecutorial Misconduct

Petitioner first contends that the gang conviction and enhancements were the product of prosecutorial misconduct.  Specifically, Petitioner challenges the prosecution's successful attempt to admit an out-of-court statement a witness, Pha Buakhai, regarding the gang charge and enhancements.  This contention is without merit.

1.  The Superior Court's Opinion.

The Superior Court, in the last reasoned decision of the state courts, rejected Petitioner's claim as being both procedurally barred and on its merits:

> The court notes that each of these issues is one that Petitioner should have raised on appeal, and he provides no justification for pursuing these issues through his petition as opposed to through appeal.  Nevertheless, the court will address those issues.
>
> With respect to [prosecutorial misconduct], the People did not "misrepresent" evidence at trial.  Nor did the prosecutor's cross-examination of the defendant's expert constitute prosecutorial misconduct.  Certainly, the use of inadmissible evidence or the use of evidence or statements contrary to a court order can constitute prosecutorial misconduct.  (See People v. Hudson (1981) 126 Cal.App.3d 733, 742.)  However, the use by the prosecutor of a statement on cross-examination of the defendant's expert does not reach the level of "misconduct" such that Petitioner was denied due process.  At most, the prosecutor's question might have warranted an objection.  Even if the question was improper, evidence of Petitioner's gang status and the enhancement was so extensive that even if the prosecutor's question was improper, there is little likelihood that the result of the trial would have been any different.

(LD 4, Ex. B, pp. 35-36).

2.  Federal Standard.

a.  Procedural Default

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . ."); see also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate

8

cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

Under well-established California law, California courts in a habeas corpus proceedings will not review the merits of a claim if that claim could have been raised in a timely direct appeal but was not. In re Dixon, 41 Cal.2d 756, 759 (1953) ("[I]n the absence of special circumstances constituting an excuse for failure to employ [the] remedy [of direct review], the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction"). Despite the petitioner's failure to bring a claim on direct appeal from a conviction, a California court will hear the merits of case if the court finds one of four exceptions: 1) fundamental constitutional error; 2) a lack of fundamental jurisdiction by the trial court over the petitioner; 3) the trial court's acting in excess of jurisdiction; and 4) an intervening change in the law. Fields, 125 F.3d at 763, *quoting*, In re Harris, 5 Cal.4th at 828-842.

Since the California Supreme Court's 1998 decision in In re Robbins, 18 Cal.4th 770, 811-812 & n. 32 (1998), the Dixon rule has been held to be independent of federal law. Park v. California, 202 F.3d 1146, 1152 (2000). Hence, any state court ruling procedurally barring a habeas claim because the petition failed to raise that claim in his direct appeal, is barred from federal habeas review unless the petitioner can demonstrate (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice. Harris v. Reed, 489 U.S. 255, 262-263 (1989); Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546 (1989).

b. Prosecutorial Misconduct

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 171 (1986) (*quoting* Donnelly v. DeChristoforo, 416 U.S. 637, 643, (1974)); *see* Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995). To constitute a due process violation, prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (*quoting* United States v.

Bagley, 473 U.S. 667 (1985)).  Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial, i.e., that absent the alleged impropriety the verdict probably would have been different.

A prosecutor's solicitation of inadmissible evidence in a state criminal proceeding is not subject to federal habeas review unless a specific federal constitutional guarantee is violated or the error is of such magnitude that the result is a denial of fundamental due process and the right to a fair trial.  See Estelle, 502 U.S. at 67; Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1984); Jefferies v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993).  State law foundational and admissibility questions raise no federal question.  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).  Since this ground for relief pertains to an issue of evidentiary error, Petitioner fails to raise a federal question as required for federal habeas review.

However, in Payne v. Tennessee, the Supreme Court stated that if evidence introduced at a criminal trial "is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  501 U.S. 808, 825, 111 S.Ct. 2597 (1991) (citing Darden v. Wainwright, 477 U.S. 168, 170-83, 106 S.Ct. 2464 (1986)).  Darden provides that the "relevant question" is whether admission of the challenged evidence "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  477 U.S. at 181, 106 S.Ct. 2464; Romano v. Oklahoma, 512 U.S. 1, 12, 114 S.Ct. 2004 (1994) ("The relevant question in this case . . . is whether the admission of evidence regarding petitioner's prior death sentence so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process").

3.  Analysis.

a.  Procedural Default

Since the Superior Court concluded, albeit somewhat obliquely, that the claim was barred because it should have been raised on direct appeal, and since that state bar is clearly both adequate and independent, it will be enforced by the federal court on habeas review unless Petitioner shows cause and prejudice or a fundamental miscarriage of justice.  Harris, 489 U.S. at 262; Coleman, 501

1  U.S. at 750.  In his Traverse, Petitioner has not asserted either contention.  Rather, he makes the

2  simple and clearly erroneous assertion that the procedural bar identified by the Superior Court is not

3  independent of federal law.  (Doc. 15, p. 12).  As discussed above, that is incorrect.  The bar has been

4  deemed independent of federal law since 1998.  Park, 202 F.3d at 1152.  Accordingly, the claim is

5  barred in these proceedings.

6                              b.  Prosecutorial Misconduct.

7          However, even were the claim not barred, it fails on its merits because Petitioner is unable to

8  satisfy the requirements of Payne and Estelle.  First, the prosecution did not fail to disclose

9  exculpatory evidence, did not offer manufactured, false, or perjured testimony or evidence, and did not

10  seek to admit clearly inadmissible evidence.  Rather, the prosecutor cross-examined a defense expert

11  with an out-of-court statement by a witness not called at trial because she had disappeared.  In the

12  Court's view, there may be other colorable legal objections but misconduct by the prosecutor is not

13  among them.  It was within trial counsel's purview to object to any improper questions and within the

14  authority of the trial judge to permit or forbid the challenged questions.  However, merely posing a

15  question that is subsequently deemed to elicit inadmissible evidence is not, without more, sufficient to

16  establish prosecutorial misconduct.

17          In any event, the state habeas court concluded that any error was harmless given the wealth of

18  other evidence presented at trial that Petitioner was a gang member.  This evidence, cited by

19  Respondent, includes evidence that Petitioner was viewed as a gang leader by other gang members,

20  that he was involved in a fight between gangs for gang-related purposes and goals, and that he shouted

21  out gang-related slogans during that fight.  (Reporter's Transcript ("Volume RT"), Volume 4, pp. 473-

22  583; 597-598; 609-611).  Accordingly, any error in the solicitation and admission of the out-of-court

23  statement by the witness Buakhai did not have a "substantial and injurious" effect on the jury's verdict

24  regarding Petitioner's membership in a street gang.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

25          B.  Confrontation Clause Violation

26          Petitioner next contends that his Sixth amendment right to confront witnesses was violated

27  when the trial court permitted testimony from a witness that was not subject to cross-examination.

28

11

This contention is also without merit.

       1.  <u>The 5th DCA's Opinion</u>.

The 5th DCA rejected Petitioner's claim as follows:

As stated in the preceding section, Bin called Hernandez as an expert witness on his behalf. Hernandez testified that CWA was more of a neighborhood social gang than a criminal street gang. Hernandez also opined that the facts of this case did not suggest a gang confrontation, but instead suggested a dispute over a woman.

The prosecutor sought to impeach Hernandez with statements made by Buakhai when she was interrogated shortly after the shooting. Over defense objections, the trial court permitted the following exchange:

"[PROSECUTOR]: Q. Are you aware that Pha Buakhai allegedly said that Rathana Reach told Sithy Bin and the rest of the group that DOTN gang members, whom you had problems with were disrespecting the CWA gang?

"[HERNANDEZ]: Um, I'm aware that that is alleged in the report.

"[PROSECUTOR]: Okay. Isn't that an indication that's more than just a one-on-one incident, that that's dragging in other gang members into this conflict?

"[HERNANDEZ]: If the allegation is true, then that would be consistent with gang behavior.

"[PROSECUTOR]: Now, are you stating absolutely your opinion that this crime was not gang related?

"[HERNANDEZ]: I'm saying it can be or would be consistent with.

"[PROSECUTOR]: So, it can be. It's consistent with not being gang related, but could be gang related?

"[HERNANDEZ]: What I said was, if the allegations were correct, then that behavior would be consistent with gang behavior.

"[PROSECUTOR]: Okay. I'm just asking for your general opinion. In this case, based on the facts as you know them, can you one hundred percent say that your opinion is that this was not gang related.

"[HERNANDEZ]: No."

Bin contends that his Sixth Amendment right to confront witnesses was violated by this exchange because Buakhai was not a witness at trial and allegedly was unavailable because she had absconded from probation and her whereabouts were unknown. Bin's argument rests on <u>Crawford v. Washington</u> (2004) 541 U.S. 36 (<u>Crawford</u>), which held that the Sixth Amendment prohibits evidence of testimonial statements obtained before trial unless the defendant has an opportunity to cross examine the declarant. (<u>Crawford</u>, at pp. 58, 68.)

If we assume that the above examination violated the Sixth Amendment, reversal is not required if "we [conclude] beyond a reasonable doubt that the jury verdict would have been the same absent any error. [Citations.]" (<u>People v. Harrison</u> (2005) 35 Cal.4th 208, 239.) We conclude that reversal under this standard is not required.

The issue to which the challenged statement applied was whether this dispute was between two criminal street gangs, CWA and DOTN, or whether the confrontation simply was a dispute over a woman. While it was clear (despite Bin's testimony to the contrary) that the dispute originated with Reach taking S.S.'s girlfriend for a ride in his car, the People contended that the ensuing events resulted in a CWA member believing the gang was disrespected by S.S. According to the People, this disrespect required CWA members to confront the other gang to regain the respect they believed was due. The prosecution's evidence to support this theory was very strong. We have reviewed this testimony at length in the preceding sections.

Bin, on the other hand, relied on his testimony and that of Hernandez to support his theory that he was acting as a peacemaker in the dispute over the woman and other friends being abused at school. Bin's testimony is self-serving, and justifiably subject to skepticism. Moreover, his testimony was contradicted by his action in bringing a handgun to the confrontation, his presence with several other CWA gang members, the gang slogans spewing forth from both sides, and that Bin apparently threw the first punch.

Hernandez's testimony did not assist Bin. His opinion, that CWA was not a criminal street gang but instead a group of individuals of similar ethnicity from the same neighborhood who formed a gang to assist in acclimating to a new culture, simply was not supported by the evidence summarized above. CWA's inclusion of other ethnicities, and the commission of various crimes including murder, is completely inconsistent with this theory.

The strength of the People's case, the obtuseness of the exchange at issue, and the instructions that emphasized that the matters relied on by the experts were not independent proof of any fact, convince us beyond a reasonable doubt that the result would have been the same even if the above exchange had been excluded.

(Ex. A, pp. 16-18).

        2. <u>Federal Standard</u>.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right "to be confronted with witnesses against him." U.S. Const. amend. VI.  The Confrontation Clause applies to all "testimonial" statements, including "testimonial hearsay" or out of court statements. <u>Crawford v. Washington</u>, 541 U.S. 36, 50–51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).  "[T]he basic objective of the Confrontation Clause ... is to prevent the accused from being deprived of the opportunity to cross examine the declarant about statements taken for use at trial." <u>Michigan v. Bryant</u>, ––– U.S. ––––, ––––, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011) (emphasis added).  "[I]f a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause .'" <u>Williams v. Illinois</u>, ––– U.S. ––––, ––––, 132 S.Ct. 2221, 2243, 183 L.Ed.2d 89 (2012) (quoting <u>Bryant</u>, 131 S.Ct. at 1155). In <u>Bryant</u>, for example, the Supreme Court

13

held that a shooting victim's answers to police questions were not testimonial and therefore outside the scope of the Confrontation Clause because the victim provided his answers "to enable police assistance to meet an ongoing emergency," not for the primary purpose of serving as evidence at trial. Bryant, 131 S.Ct. at 1166–67.

While Crawford specifically left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" it gave examples. "Whatever else the term covers, it applies at minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. at 68.  In a subsequent case, the Supreme Court elaborated on its holding in Crawford in the context of a phone call placed to a 911 operator during an ongoing emergency, exploring the parameter of statements which were "testimonial" in nature.  See Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Davis court distinguished testimonial and nontestimonial statements to police as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822.

More recently, the United States Supreme Court expanded on the legal definition of "testimonial" as follows:

> Davis did not "attemp[t] to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial." Id., at 822, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224. [Footnote omitted.] The basic purpose of the Confrontation Clause was to "targe[t]" the sort of "abuses" exemplified at the notorious treason trial of Sir Walter Raleigh. Crawford, 541 U.S., at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177. Thus, the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial. [Footnote omitted.] See id., at 43–44. Even where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial. When, as in Davis, the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be other circumstances, aside from ongoing emergencies,

14

when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.

Michigan v. Bryant, ⸻ U.S. ⸻, ⸻, 131 S.Ct. 1143, 1155, ⸻L.Ed.2d ⸻, ⸻ (2011).

Michigan v. Bryant thus makes clear that what matters for determining whether a statement is "testimonial," and thus subject to Crawford, is whether, viewed objectively, the "primary purpose" of procuring the statement was to create "an out-of-court substitute for trial testimony." Id. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." Id.

The rule proscribed by Crawford, of course, applies only to hearsay statements that are testimonial in nature and, therefore, does not prohibit admission of non-testimonial hearsay statements. See Giles v. California, 554 U.S. 353, 376, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) ("[O]nly testimonial statements are excluded by the Confrontation Clause.") (emphasis in original); Whorton v. Bockting, 549 U.S. 406, 420, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) ("[T]he Confrontation Clause has no application to" an "out-of-court non[-]testimonial statement.").

3. Analysis.

Respondent contends that the statement given by Buakhai that appeared in the police report was not used to establish the truth of the matter asserted, but rather was introduced for impeachment purposes to assess the value of the expert's opinion concerning whether the crimes were gang-related. (Doc. 12, p. 23). Respondent reasons that "because the statement was admitted for a non-hearsay purpose, the Confrontation Clause did not bar its use." (Id.).

The reasoning of the Crawford-Bryant-Davis line of cases centers essentially on whether the statements by the witness were intended as a substitute for trial testimony, Michigan v. Bryant, 131 S.Ct. 1155, or were made with an "eye towards trial," Crawford, 541 U.S. at 51. In that regard, Crawford unequivocally concludes that statements given by witnesses to police are testimonial:

Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,"

[Citation]; "extrajudicial statements... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," White v. Illinois, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," [Citation]. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, ex parte testimony at a preliminary hearing.

<u>Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.</u> Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not sworn testimony, but the absence of oath was not dispositive.

Crawford, 541 U.S. at 51-52.(Emphasis supplied).

Therefore, it would appear, at first blush, that Buakhai's statement, given to police during questioning after the altercation, would fall squarely within the ambit of Crawford.  The Crawford court pointed out, however, that the Confrontation Clause "also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  Crawford, 541 U.S. at 59, n. 9, citing Tennessee v. Street, 471 U.S. 409, 105 S.Ct. 2079 (1985).  In Street, the Supreme Court held that the Confrontation Clause was not violated by the introduction of an accomplice's confession for the non-hearsay purpose of rebutting the defendant's testimony that his own confession was coercively derived from the accomplice's earlier statement.  Defendant had argued that police had taken his accomplice's confession and then told defendant to say the same thing.  When the accomplice's confession was admitted to rebut the defendant's claim of coercion, it was accompanied by a limiting instruction.

In this case, by contrast, the prosecutor did not introduce Peele's out-of-court confession to prove the truth of [the accomplice's] assertions. Thus, as the Court of Criminal Appeals acknowledged, [the accomplice's] confession was not hearsay under traditional rules of evidence. [Citation]; <u>accord</u>, Fed.Rule Evid. 801(c). In fact, the prosecutor's nonhearsay use of [the accomplice's] confession was critical to rebut [Street's] testimony that his own confession was derived from [the accomplice's]. Before the details of [the accomplice's] confession were admitted, the jury could evaluate the reliability of [Street's] confession only by weighing and comparing the testimony of [Street] and Sheriff Papantoniou. Once [the accomplice's] statement was introduced, however, the jury could compare the two confessions to determine whether it was plausible that [Street's] account of the crime was a coerced imitation.

The nonhearsay aspect of [the accomplice's] confession-not to prove what happened at the murder scene but to prove what happened when respondent confessed-raises no Confrontation Clause concerns. The Clause's fundamental role in protecting the right of cross-examination,

16

see Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965), was satisfied by Sheriff Papantoniou's presence on the stand. If [Street's] counsel doubted that [the accomplice's] confession was accurately recounted, he was free to cross-examine the Sheriff. By cross-examination respondent's counsel could also challenge Sheriff Papantoniou's testimony that he did not read from [the accomplice's] statement and direct [Street] to say the same thing. In short, the State's rebuttal witness against respondent was not [the accomplice], but Sheriff Papantoniou. See generally Anderson v. United States, 417 U.S. 211, 219-220, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974).

Street, 471 U.S. at 414-415.

Here, Respondent's arguments notwithstanding, the factual context is distinguishable from Street. The defense expert, Hernandez, was asked by the prosecution whether Hernandez was aware of Pha Buakhai's statement to police that Rathana Reach told Petitioner and the rest of the group that the rival gang members were "disrespecting" Petitioner's CWA gang. The question was posed to Hernandez to challenge not only his ultimate opinion that CWA was a "social" organization and not a criminal street gang but also the facts and assumptions upon which Hernandez had relied to reach that opinion. The question was relevant because it was probative of whether the confrontation between the CWA and the rival gang was a "garden-variety" gang confrontation arising out of perceived slights and acts of "disrespect," or whether it was merely a non-gang-related controversy over a woman who had ties to members of each group. Petitioner's theory of the case involved the latter view, i.e., a fight over a woman, while the prosecution's theory involved the former, i.e., gang-related activity.

Respondent contends that Buakhai's statement was not offered for the proof of the matter asserted, i.e., that the altercation was gang-related and involved "disrespect" by the rival gang of Petitioner's gang, but instead to challenge the credibility of Hernandez. Therefore, Respondent reasons the statement does not fall within the ambit of Crawford. The Court cannot agree.

By proffering Buakhai's statement, the prosecution was seeking not to challenge the veracity or credibility of the defense expert, but instead to confront Hernandez with evidence that directly contradicted Hernandez's own opinion as well as the facts he had relied upon in forming that opinion. While challenging an expert's underlying factual assumptions or ultimate opinion with a conflicting fact or statement can perhaps be characterized, in the abstract, as a kind of attack on the expert's overall credibility as a witness, as a practical matter, the primary purpose for posing the question was

17

to get Hernandez to admit that facts existed, i.e., Buakhai's statement, that were contrary to his own opinion, i.e., that the incident was not simply a fight over a woman, but a gang altercation.  Seen in that light, the statement was offered for the truth of the matter asserted, i.e., that the gang started the confrontation because it felt it was disrespected by the rival gang, and not simply to impeach Hernandez.  Under such circumstances, it is difficult for the Court to see how Buakhai's statement falls outside the ambit of the Confrontation Clause.

That being said, however, it is equally obvious that the violation was harmless under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  A Confrontation Clause violation is subject to the harmless error analysis.  Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431 (1986). The Court must thus determine whether, in the context of the trial as a whole, the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637(quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239 (1946)).

The 5th DCA concluded that the evidence that the altercation was driven by gang dynamics, not by a dispute over a woman, was "very strong."  The Court agrees.  Abundant evidence was presented at trial that the two gangs were at odds with each other, that CWA members felt obliged to retaliate against the rival gang for a perceived lack of respect, that they shouted gang slogans during the altercations, and that at least one prosecution gang expert opined that the altercation was the result of a gang rivalry.  Moreover, the state court noted the "obtuseness" of Buakhai's statement, the general weakness, even ambivalence, of Hernandez's expert testimony, and the trial court's repeated admonishments to the jury that the hearsay facts relied upon by expert witnesses were not independent proof of any fact at issue.  Viewing this evidence as a whole, the Court agrees with the state court that the error was harmless, i.e., that the admission of Buakhai's statement did not have a "substantial and injurious effect" on the jury's verdict.  Brecht, 507 U.S. at 637.  Accordingly, the claim should be rejected.

C. <u>Insufficiency of the Evidence</u>

Next, Petitioner claims that insufficient evidence was presented to sustain his conviction on the gang charges and gang enhancements.  This contention, too, is without merit.

18

1         1. <u>The 5th DCA's Opinion</u>.

2     The 5th DCA rejected Petitioner's claim as follows:

3     **Sufficiency of the Evidence**
      Counts II (discharge of a firearm at an occupied building) and III (assault with a semiautomatic

4     firearm) alleged as enhancements that Bin committed the charged felonies for the benefit of, at
      the direction of, or in association with a criminal street gang, with the specific intent to

5     promote, further, or assist in criminal conduct by gang members pursuant to section 186.22,
      subdivision (b). Count IV of the information charged Bin with being an active member in a

6     criminal street gang pursuant to the provisions of section 186.22, subdivision (a). Bin argues
      that neither the enhancement nor the substantive charge was supported by substantial evidence.

7

8     "When considering a challenge to the sufficiency of the evidence to support a conviction, we
      review the entire record in the light most favorable to the judgment to determine whether it

9     contains substantial evidence-that is, evidence that is reasonable, credible, and of solid value-
      from which a reasonable trier of fact could find the defendant guilty beyond a reasonable

10    doubt. [Citation.]" (<u>People v. Lindberg</u> (2008) 45 Cal.4th 1, 27.) "[T]he relevant question is
      whether, after viewing the evidence in the light most favorable to the prosecution, any rational

11    trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
      [Citation.]" (<u>Jackson v. Virginia</u> (1979) 443 U.S. 307, 318-319; see also <u>People v. Staten</u>

12    (2000) 24 Cal.4th 434, 460 ["An identical standard applies under the California
      Constitution"].) "[I]t is the jury, not the appellate court which must be convinced of the

13    defendant's guilt beyond a reasonable doubt." (<u>People v. Bean</u> (1988) 46 Cal.3d 919, 933.) "In
      a case ... based upon circumstantial evidence, we must decide whether the circumstances

14    reasonably justify the findings of the trier of fact, but our opinion that the circumstances also
      might reasonably be reconciled with a contrary finding would not warrant reversal of the

15    judgment. [Citation.]" (<u>People v. Proctor</u> (1992) 4 Cal.4th 499, 528-529.)

16    We begin with a review of the relevant testimony. The testimony of the events leading up to
      the confrontation between the two groups offered no major disagreements. S.S.'s girlfriend

17    went for a ride in Reach's vehicle. S.S. became upset when he returned to the party and
      discovered his girlfriend was in someone else's vehicle. An argument occurred with S.S. when

18    Reach and the girlfriend returned. Reach told officers that S.S. challenged him to a fight.
      Reach left right after threatening S.S. and then raced his car up and down the street in front of
      the party, apparently to impress S.S. or S.S.'s girlfriend.

19

20    Reach ended up at Bin's house a short while later. Bin was present along with Khe, H.T., P.N.,
      Bin's brother, and at least two females. Reach related the events that occurred at the party. The

21    group decided to return to the party. Although Bin and P.N. stated they returned to discuss the
      matter, along with an issue regarding P.N. and another individual, the jury was not required to

22    believe this self-serving testimony. Bin decided to bring his personal handgun with him to the
      party.

23    When Bin's group arrived at the party, an angry confrontation took place, with each side
      yelling gang slogans. S.S. testified that Bin's group wanted to fight, but S.S. wanted the fight to

24    occur at a location where the elders would not be present. In at least one account, Bin started
      the physical confrontation by attacking S.S. Shots were eventually fired with Bin's handgun,

25    and Bin admitted he also fired the handgun.

26    The witness who tied these facts together for the prosecution was Modesto City Police Officer
      Ra Pouv, who testified as a gang expert. Bin does not challenge Pouv's qualifications, so we

27    will not repeat them. Pouv testified that "CWA" stands for Crips With Attitude, and the gang
      started 10 to 15 years ago in Modesto. Originally, "CWA" stood for Cambodian With Attitude,

28

but as the gang grew, different nationalities joined and the name changed to reflect this diversity. The gang often is referred to as "C-Dubb." The total number of gang members varies for several reasons, including that members stop affiliating with the gang when they become older, get jobs, and start families.

Pouv opined that Khe was a CWA gang member and provided substantial evidence to support his opinion, including multiple admissions by Khe to his gang membership. Pouv opined that Reach was an associate to CWA on the date of the incident.

Pouv also opined that Bin was an active CWA gang member on the date of the incident. As a basis for that opinion, Pouv relied on several field information cards, the first dated January 14, 1998, which indicated that Bin was with another CWA gang member; Bin admitted he was a gang member; and he was wearing gang colors. A field information card dated March 30, 1999, indicated that Bin admitted membership in CWA, was with another CWA gang member, and was wearing gang colors. A field information card dated September 17, 1999, indicated that Bin claimed he was a former member of CWA, but he still considered himself to be a Crip. Bin was with two other CWA gang members at the time and was dressed in gang colors. A field information card dated December 17, 1999, indicated that Bin admitted he was a CWA gang member; he was with another CWA gang member; and he was wearing gang colors. Bin also has a tattoo of the letters "CWA" on his left wrist, and a tattoo of a dragon head on one of his legs. Pouv also based his opinion on the facts of the incident itself. Bin was with other CWA gang members at the time of the incident and witnesses identified Bin was one of the individuals yelling gang slogans at the scene.

S.S. admitted to Pouv that he was a member of the Tiny Rascal gang, which associated with the DOTN gang. S.Y. admitted he was at the party, and admitted he was a DOTN gang member.

Pouv also opined that CWA gained "respect" from other gangs and the community by committing acts of violence. These acts of violence establish that CWA is a violent gang, thus instilling fear in, and intimidating, other gangs and the community. Pouv opined that the shooting in question occurred because CWA gang members felt they were being disrespected by the DOTN criminal street gang. As a result of the perceived disrespect, the CWA gang members confronted the DOTN gang at the party. The shooting was an act of violence to obtain the respect of the DOTN gang and the community. The respect and intimidation that was generated by the shooting benefited and promoted the CWA gang. In Pouv's opinion, that the dispute began over a woman, was irrelevant. Once the confrontation began, the issue came down to the respect CWA demanded. Nor was it relevant that some of the individuals in the two gangs had socialized in the past. Once the confrontation occurred, the issue was respect, not past relationships or the cause of the confrontation.

Pouv was not aware of any rivalry between the DOTN and CWA gangs. Nor did the event occur on DOTN turf.

Bin testified in his defense. He admitted he was a member of CWA at one point, but he dropped out in 1999 when his daughter was born and he moved out of Modesto. He also admitted that in 2004 he purchased the semiautomatic handgun used in the incident. Bin stated he had been attacked by strangers and felt he needed the gun for protection.

On the date of the incident Bin was living with his parents. At approximately 4:00 p.m. he was in front of his parents' house cooking on a grill. Present were Bin, his mother, father, brother, both of Bin's children, Bin's girlfriend Pha Buakhai, and his brother's girlfriend. Khe, H.T., and P.N. eventually came over to socialize with Bin's brother. After everyone ate, Reach came over to the house. Reach started bragging that he took a girl out at a party. Reach said the party was

20

at S.S.'s house. Bin decided he wanted to go to the party because he wanted to talk with S.S. and S.Y. because S.S. and four or five other kids were "picking on" H.T. and P.N. at the school they all attended. Bin wanted to resolve the problems at school.

Bin and the others drove to the party. Bin had his firearm with him because he was paranoid after the incident where he was attacked and seriously injured. Bin gave the firearm to Buakhai upon arriving at the party. Bin then approached S.S. and S.Y. Bin could see the hostility in the group that was with S.S. and S.Y. At this point S.S. told Bin about the incident involving Reach and S.S.'s girlfriend. S.S. stated that everything would be dropped if he and Reach could fight each other. As Bin attempted to talk S.S out of the fight, S.S.'s friends surrounded Bin, S.S. and S.Y. Others in the group stated they wanted to fight and appeared to be getting aggravated. The groups began yelling gang slogans at each other. S.S. and his friends decided they wanted to fight at the park and most of them started to walk away. Bin began walking towards his car. As he reached the vehicle, he was attacked from behind. When he turned around he saw S.S. and S.Y. A fight broke out. Bin heard gunshots as he was fighting. Bin saw Buakhai shooting about 12 feet from his location. She shot the gun about five times. Buakhai pointed the gun behind where he and the others were fighting. Bin ran up and grabbed the gun from Buakhai. As he backed up towards the vehicles, he saw S.S.'s group approaching again. Bin shot the gun in the air to keep the group away from him. Bin and his companions jumped into the vehicles and left.

Bin's retained expert, James Hernandez, testified that CWA fit the criteria for a neighborhood social group, not a criminal street gang. Hernandez also opined that the facts of this case did not necessarily place the case into the context of a gang conflict.

## A. Section 186.22, subdivision (b) enhancement

The section 186.22, subdivision (b) enhancement requires the prosecution to prove that the defendant committed the charged felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186 .22, subd. (b)(1); see also CALCRIM No. 1401.) Bin argues the enhancement was not supported by substantial evidence because it failed to show that he had the specific intent to promote, further, or assist in criminal conduct by CWA. We disagree.

Bin's argument reads much like one would expect a closing argument to sound at trial. It focuses on the facts favorable to Bin and ignores the facts that are inconsistent with Bin's theory. He asserts that the conflict was merely a dispute over a girl and some bullying occurring at a local school. He minimizes any gang yelling as childish name calling. He dismisses Pouv's opinion as an improper conclusion on the topic of how the case should be decided. Each of these assertions simply is incorrect.

The entire record provides ample support for the jury's finding. Bin was an admitted CWA gang member and, although he left the area for a period of approximately five years, when he returned he immediately began associating with CWA gang members. When Bin learned of a conflict with DOTN gang members, he immediately went to a party at which DOTN gang members were present to address the issue. While Bin claimed an entirely innocent motive to this confrontation, the facts are (1) he took a loaded semiautomatic handgun to the confrontation, (2) he was accompanied by four CWA gang members or associates, (3) CWA gang members began yelling gang slogans at DOTN gang members, (4) at least one witness testified that Bin threw the first punch, and (5) Bin fired the handgun repeatedly at the residence. Moreover, the jury reasonably could have rejected Bin's self-serving testimony that (1) he wanted only to talk with DOTN gang members, (2) he fought only in self-defense, and (3) he fired the handgun in the air and only in self-defense.

Bin's assertion that Pouv's opinion should have been excluded because it "was an improper opinion on the ultimate issue" is not persuasive. To support this assertion, Bin cites People v. Killebrew (2002) 103 Cal.App.4th 644 (Killebrew), a case from this court. However, an analysis of Killebrew and a recently issued opinion from this court, People v. Ramon (2009) 175 Cal.App.4th 843 (Ramon), establishes the distinction between an improper opinion and one supported by the facts of the case.

Killebrew was convicted of conspiracy to possess a handgun. Killebrew was arrested after he was observed in the area of a police stop of a vehicle in which four gang members were driving and in which a handgun was located. Two other vehicles were observed by officers driving in formation with the stopped vehicle. These vehicles were located by other officers at a nearby fast-food restaurant. Officers located a handgun hidden in a box next to the garbage bin utilized by the restaurant. The only fingerprint on the box and the handgun did not belong to Killebrew or anyone else in any of the vehicles. Killebrew was not placed inside any of the three vehicles, although he was identified as a member of the same gang as the individuals who were riding in the vehicles. The People theorized that Killebrew was in one of the vehicles. The People then called an expert witness who opined (1) the three vehicles were driving together, (2) if one member of the group possessed a handgun, he would tell every other member of the group that he had the handgun, and (3) each member of the group therefore would jointly possess the handgun.

We held that these opinions, about the subjective knowledge and beliefs of the people in the vehicles, were improper opinions that should have been excluded because they did nothing more than inform the jury of how the witness believed the case should be decided. (Killebrew, supra, 103 Cal.App.4th at p. 658.) This conclusion was obvious because the officer did not have any basis for concluding that the individual who possessed the gun that night informed any of the occupants of any of the vehicles that he had a gun, or that any of the remaining occupants took any action to suggest that they approved of the presence of the gun, or that they intended to use the gun on that night if necessary. The expert's opinion was speculation because there was nothing in the evidence that supported the conclusions he reached.

Ramon also is instructive. Ramon was arrested for driving a stolen vehicle and various offenses related to possession of a firearm. The People presented the testimony of a law enforcement officer as an expert on criminal street gangs. This expert testified that Ramon was a member of a criminal street gang, and he was in territory claimed by the gang at the time he was stopped and arrested. The officer opined that possession of a stolen vehicle and possession of a firearm benefited the criminal street gang because they could be used to commit crimes that benefited the gang, and the crimes were committed with the specific intent to promote the criminal street gang. We concluded that the officer's testimony was not supported by substantial evidence.

> "The People's expert simply informed the jury of how he felt the case should be resolved. This was an improper opinion and could not provide substantial evidence to support the jury's finding. There were no facts from which the expert could discern whether Ramon ... [was] acting on [his] own behalf the night [he was] arrested or [was] acting on behalf of the [gang]. While it is possible [he was] acting for the benefit of the gang, a mere possibility is nothing more than speculation. Speculation is not substantial evidence. [Citation.] ' "To be sufficient, evidence must of course be substantial. It is such only if it ' "reasonably inspires confidence and is of 'solid value.' " ' ' By definition, 'substantial evidence' requires evidence and not mere speculation. In any given case, one 'may speculate about any number of scenarios that may have occurred.... A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.... A finding of fact must be an inference drawn from evidence rather than ... a mere

speculation as to probabilities without evidence.' " ' [Citation.]" (<u>Ramon, supra</u>, 175 Cal.App.4th at p. 851.)

The complete lack of any evidence that Ramon was acting on behalf of the criminal street gang to which he belonged compelled our conclusion that the expert had no basis for testifying that the crime benefited the gang or was committed with the specific intent to promote the gang.

Here, on the other hand, there was ample evidence to support Pouv's opinions. The evidence established that an associate of CWA got into a confrontation with a member of DOTN. This associate, Reach, left after being challenged to a fight. A logical deduction from these largely uncontested facts was that Reach, and consequently CWA, was disrespected by the other gang.

Reach then met with other members of CWA, including Bin. Bin not only decided to accompany the group, he brought a firearm with him. While Bin claimed it was solely for protection, the jury could have inferred that the firearm was brought along to ensure CWA received the respect the group felt was due. The group obviously decided to address the situation because they drove back to the party, where a confrontation turned into fisticuffs. At least one witness testified that Bin started the fisticuffs by attacking S.S. Before the fisticuffs began, gang slogans were shouted by both CWA and the opposing gangs.

While it was undisputed that the firearm was fired first by Buakhai, Bin admitted that he too fired the gun. The jury logically could have inferred that Bin's purpose in firing the gun was to ensure that the opposing gang knew CWA was armed and would do whatever was necessary to establish its dominance.

Each of these facts formed a substantial foundation for Pouv's opinion that the crimes committed that night were committed for the benefit of the CWA criminal street gang.

**B. Section 186.22, subdivision (a) substantive charge**

Bin also contends that the evidence was insufficient to support the jury's conclusion that he was a member of a criminal street gang, in violation of section 186.22, subdivision (a). This section criminalizes active participation in a criminal street gang when the defendant knows that the gang's members engage in or have engaged in a pattern of criminal gang activity. The defendant must also "willfully promote[ ], further[ ], or assist[ ] in any felonious criminal conduct by members of that gang." (<u>Ibid.</u>) "[A] person 'actively participates in any criminal street gang,' within the meaning of section 186.22(a), by 'involvement with a criminal street gang that is more than nominal or passive.' [Citation.]" (<u>People v. Castenada</u> (2000) 23 Cal.4th 743, 752.) Bin contends that the evidence was insufficient to establish that he actively participated in CWA. Once again, we disagree.

We have recited the relevant facts in the preceding section. Bin admitted that he had been a member of CWA, but claimed that he dropped out of the gang when his daughter was born and he moved out of Modesto. It also is true that there was no testimony of police contact with Bin after 1999 until the incident in question in 2005. On the night in question, however, Bin accompanied admitted CWA members and associates to confront another gang. He was identified as instigating the fisticuffs by striking an opposing gang member. He used the gun he brought to the confrontation to shoot at the house of the opposing gang members. The jury logically could have inferred from these facts that Bin's participation in CWA was much more than nominal or passive. This evidence was more than sufficient to support the verdict.

(Ex. A, pp. 6-15).

23

2.  <u>Federal Standard</u>.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in <u>Jackson v. Virginia</u>, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is, "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u>, at 319; <u>see also Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  <u>Jackson</u>, 443 U.S. at 324.   Sufficiency claims are judged by the elements defined by state law.  <u>Id</u>. at 324, n. 16.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  <u>Payne v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" <u>See id.</u>, <i>quoting</i> <u>Jackson</u>, 443 U.S. at 319.  Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.  <u>See Jackson</u>, 443 U.S. at 324; <u>Payne</u>, 982 F.2d at 338.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326.  A jury's credibility determinations are therefore entitled to near-total deference.  <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, <u>Jackson</u> does not permit a federal court to revisit credibility determinations.  <u>See id</u>. at 957-958.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995).  However, mere suspicion and speculation cannot support logical inferences.  <u>Id</u>.; <u>see, e.g.</u>, <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1278-1279 (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of

1    aiding and abetting).

2         After the enactment of the AEDPA, a federal habeas court must apply the standards of <u>Jackson</u>

3    with an additional layer of deference.  <u>Juan H.</u>, 408 F.3d at 1274.  Generally, a federal habeas court

4    must ask whether the operative state court decision reflected an unreasonable application of <u>Jackson</u>

5    and <u>Winship</u> to the facts of the case.  <u>Id</u>. at 1275.[1]

6         Moreover, in applying the AEDPA's deferential standard of review, this Court must also

7    presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); <u>Kuhlmann v.</u>

8    <u>Wilson</u>, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state

9    appellate determinations of fact as well as those of the state trial courts.  <u>Tinsley v. Borg</u>, 895 F.2d

10   520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court

11   determinations of legal questions or mixed questions of law and fact, the facts as found by the state

12   court underlying those determinations are entitled to the presumption.  <u>Sumner v. Mata</u>, 455 U.S. 539,

13   597, 102 S.Ct. 1198 (1981).

14        In <u>Cavazos, v. Smith</u>, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court further

15   explained the highly deferential standard of review in habeas proceedings, by noting that <u>Jackson</u>

16        "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions
17        should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's
          verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed
18        with the jury. What is more, a federal court may not overturn a state court decision rejecting a
          sufficiency of the evidence challenge simply because the federal court disagrees with the state
19        court. The federal court instead may do so only if the state court decision was "objectively
          unreasonable." <u>Renico v. Lett</u>, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678
20        (2010) (internal quotation marks omitted).

21        Because rational people can sometimes disagree, the inevitable consequence of this settled law
          is that judges will sometimes encounter convictions that they believe to be mistaken, but that
22        they must nonetheless uphold.

23   <u>Cavazos</u>, 132 S.Ct. at 3.

24        "<u>Jackson</u> says that evidence is sufficient to support a conviction so long as 'after viewing the
25        evidence in the light most favorable to the prosecution, any rational trier of fact could have
          found the essential elements of the crime beyond a reasonable doubt.'  443 U.S., at 319, 99

26

27   ───────────────────────
     [1]Prior to <u>Juan H.</u>, the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an
     additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See <u>Chein v. Shumsky</u>,
28   373 F.3d 978, 983 (9th Cir. 2004); <u>Garcia v. Carey</u>, 395 F.3d 1099, 1102 (9th Cir. 2005).

S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

Cavazos, 132 S.Ct. at 6. [2]

### 3.  Analysis.

The 5th DCA has noted the salient facts and evidence supporting both the substantive gang charge and the gang enhancement: Petitioner had, on multiple occasions, admitted he was a member of the CWA gang; when Petitioner learned of a disagreement with the rival gang, he immediately went to the location where the rival gang members were assembled to address the conflict; Petitioner took a loaded semiautomatic handgun to the confrontation; he was accompanied by four active CWA gang members or associates; the CWA members began shouting gang slogans; at least one witness testified that Petitioner started the altercation by throwing the first punch; and, finally, Petitioner fired the handgun repeatedly at the residence.  From this evidence alone, a reasonable juror could have found that Petitioner committed the charged offenses "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members," (the enhancement alleged for the substantive crimes of discharge of a firearm at an occupied building and assault with a semiautomatic firearm), and that Petitioner was an active member of a criminal street gang, a substantive crime charged against Petitioner.[3]

The fact that additional evidence was presented that either contradicted the evidence discussed above or would support inferences favorable to Petitioner is irrelevant to a sufficiency analysis, since,

---

[2] The 5th DCA's opinion expressly cites the Jackson v. Virginia standard in analyzing the sufficiency claims herein. Moreover, the California Supreme Court long ago adopted the federal Jackson standard for sufficiency claims in state criminal proceedings.  People v. Johnson, 26 Cal.3d 557, 576 (1980).  Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

[3] Indeed, once the jurors found that CWA was a criminal street gang, it was but a short and logical step to find that Petitioner's conduct was in furtherance of that street gang.  Under the defense theory that the altercation centered on a dispute over a woman, the dispute would have been between Reach and S.S.  Petitioner would have had no reason to interject himself into such a personal dispute.  It is only when Petitioner's conduct is seen in the context of an altercation between two criminal street gangs that it makes sense that Petitioner would return to the party with a semiautomatic weapon and supporting gang members to re-establish respect for his own gang and its members.

in determining sufficiency, the Court considers only the evidence presented in support of the offense or enhancement and draws all reasonable inferences in favor of the prosecution.  Under those circumstances, it is patent that sufficient evidence was presented to support both the substantive crime of being an active member of a street gang and the gang-related enhancement.  Thus, the adjudication of the state court was not objectively unreasonable.

D.  Ineffective Assistance of Trial Counsel

Lastly, Petitioner contends that trial counsel was ineffective.  As with the other contentions, this too fails to raise a meritorious claim for habeas relief.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's contention as follows:

Bin argues that trial counsel was ineffective because there was evidence that would have established that it was Buakhai who shot Leang Khat, the victim, and not Bin. According to Bin, there are three items of evidence that prove Buakhai shot Khat.

First, Bin asserts that Khat's testimony establishes this fact. In essence, Bin argues that Khat testified she was struck by one of the first two or three bullets fired. Since Buakhai fired the first four to six shots, Bin theorizes Buakhai must have shot Khat.

Khat's testimony does not support Bin's argument. On direct examination, Khat testified that she heard gunfire, pretended to bend forward, and was shot simultaneously. She then lay down on the ground. On cross-examination, Khat was asked how she knew the sound she heard was gunfire. She responded, "I heard the sound, ping, ping, then I bend down, forward." She then explained that the sound was different from the sound of firecrackers.

Bin interprets Khat's quoted answer as establishing that she heard two shots and then was hit by the third shot. Khat's answer cannot be so read. She was not asked if she heard only two shots before being struck by a bullet. Instead, she was merely explaining that she heard gunfire, and used the phrase "ping, ping" to describe the gun firing. Bin's interpretation of the answer is unreasonable.

Second, Bin contends trial counsel should not have objected, and moved to strike, a portion of T.Y.'s testimony. T.Y. testified that Bin started the fisticuffs by hitting S.S. T.Y. and others then went to aid S.S. by fighting others at the scene. T.Y. saw Buakhai fire three shots straight up in the air. He then fell to the ground. Bin then took the gun from Buakhai and fired it towards the house. After T.Y. stated that there were people in front of the house, the following occurred.

"[PROSECUTOR:] Did you see the gun being pointed toward [the people in front of the garage] during the time the Defendant Bin was shooting the gun?

"[T.Y.:] By that time, all the people that was in front of the garage had ducked on the floor, too."

Trial counsel's objection to the answer as nonresponsive was sustained and the answer was

27

stricken. Bin argues that while the objection was proper, trial counsel should not have objected because the answer supports Bin's theory on appeal that it was Buakhai who shot Khat. We fail to see how trial counsel could be criticized for making a proper objection. We also fail to see how trial counsel could be criticized for not anticipating appellate counsel's new theory on appeal, especially since appellate counsel's theory is not supported by the evidence. And, the answer that was stricken does not support appellate counsel's theory. T.Y. did not testify that he saw all of the people in front of the garage when Bin began shooting towards the house. Moreover, T.Y.'s testimony that Bin was aiming in the direction of the house does not preclude a bullet from striking someone that is on the ground. The gun could have deflected downward as a result of the recoil (or Bin's correction as a result of the recoil) from a shot, thus striking someone in front of the house. An arm held straight out does not conclusively establish the firearm was pointed straight out from the arm.

Third, Bin argues that trial counsel was ineffective for failing to present evidence that Pouv testified at the preliminary hearing that Buakhai told him that she shot the firearm in both a downward and upward direction. Since Buakhai was presumably unavailable at the time of trial, Bin argues the statement was admissible as a statement against Buakhai's penal interests.

There are numerous problems with this argument. Pouv testified that Buakhai not only stated that she shot the firearm in both an upward and downward direction, but also made numerous statements incriminating Bin, including:

(1) Before going to the scene of the incident, Bin became upset because DOTN members were disrespecting CWA.

(2) Reach asked the group to return with him to the scene of the incident.

(3) Bin brought a gun with him to the scene of the incident.

(4) She took the gun from Bin when they arrived at the scene so he would not do anything "stupid."

(5) One of the DOTN gang members called Bin a derogatory term ("C-scrap") before the fight broke out.

(6) Bin was yelling "C-Dubb" before the fighting began.

(7) Bin took the gun from her and shot at the DOTN gang member.

(8) Bin told her he hid the firearm under a pile of grass in the backyard of his parents' residence.

Bin argues, of course, that only the portion of Buakhai's statement relating to her firing the firearm in an upward and downward direction should have been admitted. The law is not so helpful, however. "Evidence Code section 356 permits introduction of statements 'on the "same subject"' or which are necessary for the understanding of the statements already introduced. [Citation.]" (People v. Maury (2003) 30 Cal.4th 342, 419-420.) Therefore, once trial counsel introduced Buakhai's statement that she shot in a downward and upward direction, arguably all of the above extremely incriminating statements also could have been introduced into evidence to explain the events at the scene of the incident. It is much more likely that trial counsel would have been found ineffective had he attempted to introduce Buakhai's statement instead of ignoring it.

This argument also directly contradicts Bin's Crawford argument made in the preceding

28

section.

Finally, it is unclear from the information in the record whether Buakhai's downward shots were aimed directly adjacent to her feet, thus ensuring that they could not have struck Khat.

We could find additional reasons to reject Bin's argument, but the above are sufficient to establish that trial counsel was not ineffective. To prevail on this argument, Bin is required to establish that trial counsel's representation at trial fell below an objective standard of reasonableness under prevailing professional norms. (People v. Dennis (1998) 17 Cal.4th 468, 540.) The showing made by Bin does not meet this standard. Accordingly, he has not demonstrated that trial counsel was ineffective.

(Ex. A, pp. 18-21).

### 2. Federal Standard.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Knowles v. Mirzayance</u>, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003). Moreover, because the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

Here, the state court identified the appropriate federal standard by applying <u>Strickland</u>.  Thus, the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was neither deficient nor prejudicial, was not contrary to or an unreasonable application of <u>Strickland</u>.  For the reasons discussed below, the Court concludes that it was not.

        3.  <u>Analysis</u>.

              a.  <u>Failure To Object On Confrontation Clause Grounds</u>.

The Court has already considered and rejected Petitioner's contention that the prosecutor committed misconduct by proffering Buakhai's out-of-court statement to the police, and that any Confrontation Clause violation was *de minimis* and harmless under <u>Brecht</u>.  Accordingly, the failure of defense counsel to object at trial on these grounds could not have been deficient, or, even if technically deficient, it was certainly not prejudicial.  Accordingly, the state court's adjudication of this issue was not objectively unreasonable.

              b.  <u>Failure Of Appellate Counsel To Raise Prosecutorial Misconduct</u>.

In challenges to the effective assistance of appellate counsel, the same standards apply as with the claims of ineffective assistance of trial counsel.  <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000); <u>Smith v. Murray</u>, 477 U.S. 527 (1986).   In <u>Smith</u>, the United States Supreme Court indicated that an appellate attorney filing a merits brief need not and should not raise every non-frivolous claim.

Robbins, 528 U.S. at 288.  Rather, an attorney may select from among them in order to maximize the likelihood of success on appeal.  Id.  As a result, there is no requirement that an appellate attorney raise issues that are clearly untenable.  Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980); see also Gillhan v. Rodriguez, 551 F.2d 1182 (10th Cir. 1977).

Previously, this Court concluded that trial counsel's performance was not been deficient, that Petitioner had not been denied the effective assistance of trial counsel under Strickland, and that the prosecutorial misconduct claim was without merit.  Since Petitioner's ineffectiveness claim for appellate counsel is based on the purported failure to address deficiencies in trial counsel's performance that simply do not exist, and upon raising on appeal issues that lack merit, it is patent that no legitimate basis exists for a claim of ineffective assistance on the part of appellate counsel. Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991).

c.  Failure To Present Exonerating Evidence Regarding Great Bodily Injury Enhancement

The 5th DCA discussed at length the reasons why defense counsel might have elected not to introduce Buakhai's statement to Officer Pouv, pointing out that, at the very least, such a decision would have "opened the door" for much more damaging evidence to be admitted against Petitioner. Moreover, Buakhai's statement, standing alone, was ambiguous and did not necessarily establish that she had actually pointed the weapon at the victim before firing.  Indeed, the state court noted that defense counsel would have been more likely to be found ineffective had he attempted to present such evidence to the jury.  As Respondent correctly points out, the Strickland standard for deficient performance requires only that some reasonable attorneys might have performed as did defense counsel.  From the record in this case and the reasoning of the state court, the Court concludes that at least some reasonable attorneys would have acted as did Petitioner's attorney vis-à-vis Buakhai's statement to Pouv.  Accordingly, the first prong of Strickland was not met and the claim must be rejected.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

(Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one (21) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten <u>court</u> days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **March 7, 2014**                              **/s/ Jennifer L. Thurston**
                                                                     UNITED STATES MAGISTRATE JUDGE